## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOYCE'S JEWELRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:22-cv-01403 |
| | ) | |
| v. | ) | Mag. Judge Lisa Pupo Lenihan |
| | ) | |
| PNC BANK, NATIONAL ASSOCIATION; | ) | |
| AARON BAYLEY; ANDREW FREDERICK; | ) | |
| MELODY GRATCHIC; CHRIS HALL; and | ) | JURY DEMAND |
| JERROD MURTHA, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiff Joyce's Jewelry, Inc. ("Joyce's), by and through its undersigned counsel, for its Complaint against Defendant PNC Bank, National Association ("PNC") and PNC employees, Aaron Bayley; Andrew Frederick; Melody Gratchic; Chris Hall; and Jerrod Murtha ("Individual Defendants, and collectively, with PNC, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This action arises out of PNC's and the Individual Defendants' repeated failures to keep their customers' hard-earned money safe. As a matter of law and common sense, Defendants were and are required to maintain commercially reasonable controls against fraud, to monitor for fraud, and to apply those controls and protections with at least reasonable care and in good faith. Defendants' failures to maintain and apply controls against theft and fraud, and in response to alarming transfers and wires on Joyce's accounts, resulted in more than $1.6 million in cash losses to Joyce's, risking the viability of this nearly 40-year-old family business.

2.      The Defendants' failures here are stark and should shock and frighten small business customers who believe their accounts and accumulated savings are secure with PNC.

Around midday on May 12, 2022, cybercriminals obtained login information for **one** Joyce's employee. Due to Defendants' security failures, the cybercriminals were able to use that single employee's login credentials to transfer substantially all of the funds in all of Joyce's PNC accounts into one account and then—despite security that was supposed to require tokens from **two** Joyce's users—complete eleven wires in just over 20 hours, sending more than $1.6 million to the criminals' accounts at JPMorgan Chase and Bank of America. Defendants failed to notify Joyce's of any of the exceedingly unusual activity on its accounts or take any action to prevent losses until **after** Joyce's notified PNC and Defendant Gratchic in person on the morning of May 13. Even after being notified, Defendants failed to so much as freeze Joyce's accounts during the ongoing fraud. Defendant Gratchic, an unprepared and untrained PNC business banker at the Uniontown PNC branch, broke down in tears due to her inability to mitigate the ongoing depletion of Joyce's savings.

3.     The wires that emptied Joyce's accounts had attributes that should have rendered them highly suspect if Defendants had maintained and applied commercially reasonable controls, including because: (1) the wires were directed to accounts and businesses that Joyce's had never wired in its decades of banking with PNC; (2) the wires greatly exceeded Joyce's usual transactions by tens of thousands of dollars per wire; (3) Joyce's had never wired anywhere near one million dollars in a day; (4) the unauthorized activity included rounding up all funds in Joyce's accounts followed by successive wires; (5) the wires were in similar large amounts, several just pennies shy of $100,000 and $200,000; and (6) the wires exceeded the funds available in Joyce's accounts by a wide margin resulting in an overdraft of nearly $200,000, even though Joyce's, to its knowledge, had never overdrafted an account by even a penny.

4.      Defendants' failures allowed substantially all the liquidity that Joyce's had managed to accumulate over decades to be stolen in less than 24 hours. Adding insult to injury, PNC has refused to provide Joyce's with meaningful information regarding its efforts to recoup the funds it failed to monitor and protect. Defendants also caused Joyce's to be sent to a third-party collections agency that called and wrote to Joyce's to demand repayment of the funds Defendants' allowed the cybercriminals to overdraft. PNC, with at least the assistance of Defendant Bayley (among others), then helped itself to funds recovered by JPMorgan Chase to repay itself—fully and first—for the overdraft that Defendants improperly allowed. On top of all this, PNC is purporting to bill Joyce's for "corporate analysis charges," presumably so Defendants could analyze its own catastrophic failures to monitor and protect Joyce's accounts.

5.      PNC has repeatedly refused to take any responsibility for Joyce's losses (even while having the audacity to attempt to pitch Joyce's on new services and accounts, to send it to collections, and to assess fees—continuing to this day), forcing Joyce's to file this action.

## PARTIES

6.      Plaintiff Joyce's is a Pennsylvania Corporation with its principal place of business located in Uniontown, Pennsylvania.

7.      Defendant, PNC, is a national banking association organized under the laws of the United States with its principal place of business located in Pittsburgh, Pennsylvania. PNC is a financial institution within the meaning of 18 U.S.C. § 20 and its deposits are insured by the Federal Deposit Insurance Corporation.

8.      Plaintiff is informed and believes, and on that basis alleges, that Defendant Aaron Bayley is now, and was at all times mentioned herein, a citizen and resident of the Commonwealth of Pennsylvania.

9.      Plaintiff is informed and believes, and on that basis alleges, that Defendant Andrew Frederick is now, and was at all times mentioned herein, a citizen and resident of the Commonwealth of Pennsylvania.

10.     Plaintiff is informed and believes, and on that basis alleges, that Defendant Melody Gratchic is now, and was at all times mentioned herein, a citizen and resident of the Commonwealth of Pennsylvania.

11.     Plaintiff is informed and believes, and on that basis alleges, that Defendant Chris Hall is now, and was at all times mentioned herein, a citizen and resident of the Commonwealth of Pennsylvania.

12.     Plaintiff is informed and believes, and on that basis alleges, that Defendant Jerrod Murtha is now, and was at all times mentioned herein, a citizen and resident of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

13.     Venue is proper in the Court of Common Pleas of Fayette County, pursuant to 42 Pa. C.S.A. § 931(c) and Pa. R. Civ. P. 1006(b) and 2179(a), because Defendants carry on regular business and work for PNC in Fayette County, and because each cause of action herein arose in Fayette County or Fayette County was the location of a transaction or occurrence that took place out of which the cause of action arose.

14.     The Court of Common Pleas in Fayette County has jurisdiction pursuant to Pa. Const. Art. V, § 4 and 42 Pa. C.S.A. § 761; 42 Pa. C.S.A. § 931(a); and 42 Pa. C.S.A. § 5301. Defendants transact business and, at all times relevant to this case, work for PNC in the Commonwealth of Pennsylvania, contract to supply goods and services in the Commonwealth of Pennsylvania, carry on a continuous and systematic part of their general businesses and

employment within Pennsylvania, has engaged in substantial business with Pennsylvania entities and residents, and have caused grave harm in Pennsylvania as a result.

15.     This action belongs in state court. There is no jurisdiction for this action in federal court. Among other reasons, there is no diversity jurisdiction because PNC maintains it principal place of business within the Commonwealth of Pennsylvania and the Individual Defendants are all residents and citizens of the Commonwealth of Pennsylvania. In addition, the claims alleged in the Complaint do not permit federal question jurisdiction to be exercised because the case does not arise directly or indirectly under the Constitution, laws, or treaties of the United States.

## FACTUAL ALLEGATIONS

16.     Joyce's is a family-owned jewelry business founded by Joyce Katzeff in the early 1970s, when Ms. Katzeff began travelling southwestern Pennsylvania selling jewelry to family and friends. By 1983, her business had grown enough to open a store in her home. The business continued to flourish and, five years later, Joyce's opened a small store in Uniontown, Pennsylvania. Now, after decades of providing great products and services to its loyal customers, Joyce's has grown into the premier jeweler in southwest Pennsylvania, operating a 7,000 square-foot store in Uniontown, Pennsylvania.

17.     Joyce's has banked with PNC (or banks acquired by PNC) from its start in the 1970s.[1] In recent years, Joyce's maintained four separate accounts with PNC, ending in 8186, 8194, 4679, and 1519. The account ending in 8186 was Joyce's savings account. The account

---

[1] Joyce's has always banked at the site of PNC's Uniontown branch. On information and belief, the bank on that site in the 1980s was Gallatin Bank. Gallatin Bank was acquired by National City Bank, which PNC acquired in 2008.

ending 8194 was Joyce's wire and ACH account. The account ending in 4679 was Joyce's merchant services account. The account ending in 1519 was Joyce's operating account.

### *Joyce's Accepted PNC's Security Recommendations and Participated in PNC's Training*

18.     Between August and November 2021, Joyce's accounts were updated with new features and PNC's recommended security on PNC's PINACLE platform.

19.     As part of this process, PNC's provided Joyce's with a Treasury Management Services Comprehensive Agreement (the "Agreement").

20.     As described on PNC's website, PINACLE is PNC's "top-rated corporate online and mobile banking portal, delivers a single, customizable access point for your Corporate Banking services."[2]

21.     Joyce's update to its accounts was based on multiple communications and in-person sales pitches from PNC, including from Defendants Hall and Murtha, that included descriptions of and recommendations for security measures for Joyce's accounts.

22.     Brandon Katzeff ("Katzeff"), Joyce's CEO, participated in these communications and meetings with PNC, including with Defendants Hall and Murtha, and he agreed to all of their recommended security measures.

23.     As part of the update to PNC's PINACLE platform in 2021, PNC employees including Defendants Hall and Murtha came to Joyce's and provided in-person training on funds transfer security procedures for Joyce's employees, including Joyce's account manager, Caren D'Amico ("D'Amico").

---

[2] PNC, *Online & Mobile Banking Portal for Corporate Banking*, available at
https://www.pnc.com/en/corporate-and-institutional/treasury-management/online-and-mobile-banking.html.

24.     During PNC's meeting with D'Amico, Defendants Hall and Murtha reviewed PNC's wire procedures and security for Joyce's, including multi-factor and dual-control authorization, and also reviewed with D'Amico how she interacted with PNC's website to send wires.

25.     A multi-factor security procedure is an electronic authentication method that utilizes two or more factors or pieces of evidence to verify a customer's identity.

26.     Dual-control authorization is a procedure requiring two separate and continuously changing electronically generated tokens to take certain actions on the accounts, including wiring funds.

27.     With respect to Joyce's ability to conduct wire transfers via PINACLE, PNC recommended, and Joyce's agreed to implement, among other promised controls and security procedures, dual-control and multi-factor authentication. These security procedures required two users: one to initiate wire transfers ("User 1") and a separate user to approve wire transfers ("User 2"). Further, each user would have to enter multiple factors to verify their identity, including a username, password, and separate electronically generated tokens.

28.     Separate and apart from dual-control and multi-factor authentication expressly promised to Joyce's, PNC was and is required to have commercially reasonable security for its customers, including commercially reasonable controls for wire transfers and commercially reasonable monitoring of customer accounts for suspicious activity.

29.     Even if PNC had commercially reasonable controls (it did not), having those controls and security is not enough. These controls must be applied properly by PNC, including by Defendants Hall and Murtha, who sold and structured the services that failed to stop the transfers, as well as by Defendants Bayley, Frederick, and Gratchic, who (among others) were

responsible for detecting the ongoing fraud, freezing accounts once there was an indication of improper or unauthorized activity on Joyce's accounts.

30.     Defendants failed to act with reasonable care in their interactions and work on behalf of PNC for Joyce's, meaning that regardless of whether PNC's security was commercially reasonable (it was not), due to Defendants' negligence, Joyce's was left unprotected.

### *Joyce's Use of Wire Transfers Before the Fraud*

31.     Although the activity on Joyce's accounts on May 12 and May 13 was obviously suspect on its own and should have caused PNC and the Individual Defendants to block or hold the transfers and speak with Joyce's, the wire activity on the account was also highly unusual as compared with Joyce's specific history of wire activity.

32.     Over the decades that Joyce's maintained accounts with PNC, and before May 12, 2022, Joyce's had limited outbound wire transfer activity. While Joyce's did occasionally send wire transfers over $100,000, all of those wires were to a single vendor in India, Diatrends Jewellery Private Limited ("Diatrends").

33.     Other than wire transfers to Diatrends, Joyce's would infrequently send transfers to India for photography services or elsewhere for jewelry and watch purchases. These transfers would usually range between $2,000 and $10,000 per wire transfer.

34.     Although Joyce's did occasionally send wires over $10 thousand, the company never sent wires approaching $100,000 anywhere other than Diatrends, never sent multiple wires over $100,000 in a single day (or even in a week), and never caused an overdraft of any Joyce's account for a wire transfer.

35.     To the best of Joyce's knowledge, Joyce's never shifted funds from multiple accounts into one account, nor did Joyce's ever empty the 1519 operating account.

36.     Joyce's endeavored to follow wire procedures taught to its employees by PNC, including during the PINACLE training.

37.     From Defendants' sales pitches, PINACLE setup, trainings, and regular interactions with its longtime client, Defendants knew how Joyce's conducted its banking with PNC, including regarding wires transfers.

### The May 2022 Fraud

38.     At approximately 1 p.m. on Thursday, May 12, 2022, D'Amico, a longtime Joyce's employee who frequently interacted with PNC, attempted to navigate to PNC's PINACLE website in her usual way, by typing "PNC Bank" into her Chrome browser bar and clicking on the first link.

39.     As it turned out, the site she clicked at 1:14 p.m. was not PNC's but a "spoofed" website, with the URL www.treasury.pnckanb.com.

40.     Once she accessed the spoofed website, which to her eye looked like the normal PNC website, D'Amico entered her company number, username, password, and token. D'Amico did not enter any login information for User 2.

41.     D'Amico noticed the website was not loading properly. There was a customer service number on the webpage, which she called. The person who answered the call told D'Amico that the website was slow that day and to be patient. Because D'Amico had occasionally received this same guidance from PNC when having trouble with the real PNC website, she thought nothing of it.

42.     D'Amico was on the spoofed website until 1:41 p.m. but did not initiate or approve any wire transfers during that time.

43.     Sometime before 2 p.m., the internet service at Joyce's crashed.

44.     Around 4 p.m., D'Amico and Katzeff were subjected to a "subscription attack," which caused them to receive hundreds of emails per hour, making it impossible to sort real messages from fake ones.

45.     Around 7 p.m., PNC contacted Katzeff, alerting Joyce's to two small but suspicious charges on one of its credit cards.

46.     Katzeff called PNC's fraud prevention service line, spoke with a PNC representative, and cancelled the credit card.

47.     During the discussion about the suspicious charges and potential fraud, PNC did not mention any other suspicious activity on Joyce's accounts and, in particular, did not even mention any of the ongoing wires aggressively draining Joyce's accounts.

48.     Around 8 a.m. the next morning, Friday, May 13, 2022, Joyce's IT service began installing a temporary cellular network as a bridge until regular internet service could be restored. Once Joyce's had internet access again, Katzeff saw the activity on Joyce's accounts and, within moments, understood that the company's accounts had been hacked.

49.     Katzeff immediately called D'Amico and asked her to change her PNC passwords.

50.     D'Amico did as she was instructed, and then logged into the PNC website to confirm that the new password was working. When she did, the accounts were visible to her only for a split second. During that moment, D'Amico noticed a large transfer between accounts.

51.     D'Amico immediately called PNC.

52.     The PNC business banker on duty, Defendant Gratchic answered the phone. Defendant Gratchic asked D'Amico if she would hold. D'Amico said she could not hold because of the alarming transfers that she had just seen on Joyce's accounts.

53.     Despite D'Amico's objection, Defendant Gratchic placed D'Amico on hold. When she came back on the line, Defendant Gratchic said she saw that most of Joyce's funds had been transferred into the 1519 account and then wired out to accounts at other banks.

54.     D'Amico called Katzeff and told him to go to PNC in person right away. Katzeff did not delay and ran across the street to the Uniontown PNC branch to stop any transfers.

55.     Defendant Gratchic made calls to customer service in an attempt to freeze the accounts and cancel the wires, but she failed and no supervisor helped her. At that point, Defendant Gratchic broke down in tears and was, as far as Katzeff could tell, completely unequipped and untrained to help.

56.     Around the same time, D'Amico called PNC and spoke with Defendant Gratchic. Defendant Gratchic could see the unauthorized activity, but, as in her in-person meeting with Katzeff, she was unable to assist.

57.     Because of Defendants Gratchic's failure to do anything to protect or assist Joyce's and the time-sensitivity of the situation, Katzeff, while still at the PNC branch, texted Defendant Murtha, Joyce's usual business banker, asking for Joyce's accounts to be frozen.

58.     Katzeff told Defendant Murtha that he was "freaking out" and that Gratchic "is not getting through to anyone." Defendant Murtha told Katzeff "I'm on it" and that he was "placing a hold on all of the accounts now."

59.     Hours later that same day, at 12:32 p.m., Katzeff received an email from Defendant Frederick, the PNC cyber fraud analyst responsible for Joyce's accounts, stating that a wire of $105,123.29 to an account at Truist Bank was flagged as suspicious, and voice verification would be required before it could be completed. The email states that PNC tried to reach the initiator of the transaction by phone.

60.     This attempted wire to an account at Truist Bank appears to be the last of a dozen fraudulent wires sent from Joyce's accounts within less than 24 hours, all without authorization from Joyce's.

61.     The attempted wire to Truist Bank was the only transfer that PNC and Defendant Frederick (among others) caught before transmitting Joyce's money (and funds available only by overdraft) to unfamiliar accounts at JPMorgan Chase Bank, N.A. ("JPMorgan") and Bank of America, N.A. ("Bank of America," and, together, the "Beneficiary Banks").

62.     Defendants identified this suspicious wire and sent an alert to Joyce's only after Katzeff had already spoken to PNC about the ongoing fraud in person more than two hours earlier.

63.     Around the same time, Katzeff received a call from Defendant Frederick. Katzeff joined D'Amico to the call. The three went through D'Amico's internet history in an effort to learn what had happened on Joyce's side.

64.     On that call, Defendant Frederick quickly (and incorrectly) denied that PNC had any responsibility for any losses.

65.     A couple hours later, around 3 p.m. on Friday, May 13, Defendant Frederick sent an email with instructions for what to do next – to contact law enforcement and the Beneficiary Banks – which Katzeff promptly followed.

66.     Katzeff proceeded to contact law enforcement at the Uniontown Police Department and filed a report with Officer Kurt DeFoor (Incident No. 2205-03376).

67.     Defendant Federick's 3 p.m. email to Katzeff also included details of the twelve wires:

| Beneficiary | Amount | | BeneBankID | BeneBankName | BankReferenceNumber | BeneAccount | ConfirmedBy |
|---|---|---|---|---|---|---|---|
| ZABOR LLC | $ | 199,857.37 | '021000021 | JPMORGAN CHASE BANK, NA | 'MA5CE38255W81VCZ | '735880186 | 05/12/2022 02:38 PM ET |
| BHA MMM LLC | $ | 199,384.32 | '021000021 | JPMORGAN CHASE BANK, NA | 'MA5D9351208751IF | '779735155 | 05/13/2022 09:40 AM ET |
| ABB KADA BEST LLC | $ | 199,343.74 | '021000021 | JPMORGAN CHASE BANK, NA | 'MA5CE0520GB90D7E | '835026318 | 05/12/2022 02:19 PM ET |
| AN REID CAP LLC | $ | 198,785.83 | '026009593 | BANK OF AMERICA, N.A., NY | 'MA5CD395729A0RB0 | '435054782334 | 05/12/2022 01:40 PM ET |
| MCKRS LLC | $ | 198,736.27 | '021000021 | JPMORGAN CHASE BANK, NA | 'MA5CE1351IC91XQV | '780107535 | 05/12/2022 02:14 PM ET |
| GTMTREPO LLC | $ | 164,997.32 | '026009593 | BANK OF AMERICA, N.A., NY | 'MA5DA0407ET8069R | '375024332793 | 05/13/2022 10:04 AM ET |
| TRAVHOLL LLC | $ | 105,784.90 | '026009593 | BANK OF AMERICA, N.A., NY | 'MA5CE4354CU90659 | '237047533989 | 05/12/2022 02:43 PM ET |
| AAJ SHank LLC | $ | 105,123.29 | '061000104 | TRUIST BANK | '225CI585996O3WFA | '1180007003759 | |
| JJ BES BUT LLC | $ | 99,874.38 | '026009593 | BANK OF AMERICA, N.A., NY | 'MA5D94052GE709LP | '383022742034 | 05/12/2022 09:42 AM ET |
| JH FELIX COMPANY LLC | $ | 99,873.47 | '026009593 | BANK OF AMERICA, N.A., NY | 'MA5CE3236DP94S95 | '325167451950 | 05/12/2022 02:32 PM ET |
| EMERCADO ENTERPRISE L | $ | 99,847.38 | '026009593 | BANK OF AMERICA, N.A., NY | 'MA5CE2402HEA37ET | '8981289B2843 | 05/12/2022 02:24 PM ET |
| KS COUSER WEB COMPAI | $ | 70,000.00 | '026009593 | BANK OF AMERICA, N.A., NY | 'MA5D94206CX74AWO | '898130337305 | 05/13/2022 09:42 AM ET |

68.     According to this record, between May 12 at 1:40 p.m. and May 13 at 10:04 a.m., Defendants permitted eleven wires to be confirmed and released. Seven of the wires went to accounts at Bank of America and four of the wires went to accounts at JPMorgan. One wire for $105,123.29, sent to an account at Truist Bank, was not released and was the subject of Defendant Frederick's 12:32 p.m. tardy request for voice verification.

69.     Each of the twelve of fraudulent wires were initiated without D'Amico's approval and completed without any Joyce's employee authorizing the transfers with User 1 or User 2's token.

70.     Each of these wires was sent, or was attempted to be sent, from Joyce's 1519 operating account.

71.     In order for the 1519 account to have funds for this torrent of wire activity, the funds in Joyce's various accounts had to be transferred into the 1519 account before being transferred out.

72.     Defendants did not alert Joyce's to the transfers between Joyce's accounts or stop the transfers between Joyce's accounts until at least midday on May 13, after PNC had allowed eleven wires to be sent.

73.     Defendants did not alert Joyce's about or otherwise stop the transfers to the 1519 account even though the cybercriminals were rounding up funds from accounts outside of Joyce's

usual business accounts, including $70,690.00 out of the $74,692.94 in a PNC account of another business owned by Katzeff called Kate James LLC ("Kate James").

74.     On May 12 and May 13, 2022, neither D'Amico nor any other Joyce's employee transferred funds in Joyce's accounts to the 1519 account.

75.     On May 12 and May 13, 2022, neither D'Amico nor any other Joyce's employee or Kate James employee sent money from a Kate James account to any Joyce's account.

76.     On May 12 and May 13, 2022, neither D'Amico nor any other Joyce's employee entered any of User 2's multi-factor authentication information, such as User 2's username or password, on the "spoofed" PNC website.

77.     At minimum, without User 2's token, the controls, monitoring, and security that Joyce's expected from Defendants should have identified and prevented the wires from being approved or completed.

78.     PNC and its cyber-fraud analyst, Defendant Frederick (among others), had an obligation to maintain reasonable thresholds for monitoring account activity, including thresholds that would identify unusual withdrawals and attempted wires as well as other activity that may be associated with fraud, such as changing account email addresses or other contact information.

79.     Defendants had an obligation to monitor for account takeovers, with commercially reasonable controls in place that would notify PNC and its customers of situations suggestive of account takeovers, such as the many indicia of a takeover in this case, including account modifications paired with wire transfers, accounts drawn down to zero, the pooling of funds into a single account immediately before initiating numerous wires, and substantial overdrafts.

80. Defendants failed to fulfill their obligations and failed to act with reasonable care in providing account services to Joyce's allowing them to be robbed of virtually all of the Joyce's liquidity in 20 hours.

81. On information and belief, the unreasonableness of PNC's security, controls, and monitoring are further demonstrated by the harms suffered by other similarly situated Pennsylvania businesses, which had their accounts robbed by cybercriminals due to PNC's failures to maintain commercially reasonable security measures and to apply those measures reasonably and in good faith.

### *Joyce's Cooperated with Law Enforcement in an Effort to Freeze Accounts*

82. Within an hour of receiving Defendant Federick's email including details about the twelve fraudulent wire transfers, Katzeff filed a complaint with the FBI's Internet Crime Complaint Center (IC3).

83. Katzeff also called the Beneficiary Banks and was told by Bank of America that if law enforcement calls and informs them of potential fraud, the bank could place a 48-hour hold on the wires.

84. Katzeff contacted the Uniontown Chief of Police, Delbert DeWitt, and asked him to call the Beneficiary Banks to obtain the hold.

85. By approximately 7 p.m. on Friday May 13, the Uniontown police had spoken with both Bank of America and JPMorgan and confirmed that holds were in place.

86. That weekend, Joyce's was locked out of its PNC accounts and Defendant Murtha confirmed to Katzeff via text that there had been no further movement on the accounts – no additional wires or recoveries of the fraudulent wires.

87.     Early Monday, May 16, Katzeff spoke with an FBI agent, who reviewed Katzeff's IC3 filing.

88.     In all, Joyce's lost more than $1.6 million on May 12 and 13 from the unauthorized wires and the overdraft imposed by PNC on Joyce's.

### *PNC Disclaims Any Responsibility*

89.     On May 16, at 9 a.m., Katzeff and his wife, Rachel Katzeff, met at PNC with Defendant Murtha and the PNC branch manager, Marjorie Loukota. PNC did not have an update on the fraudulent wire transfers but instead gave Katzeff a sales pitch about opening new accounts.

90.     The following day, Tuesday, May 17, Katzeff, understanding from law enforcement that quick action on unauthorized transfers is essential to recovery, requested an update from Defendant Frederick. He did not provide any additional information about PNC's progress, if any, in getting Joyce's money back.

91.     Shortly after, Defendant Murtha—in view of the enormous loss to Joyce's and the evident failures of PNC and the Individual Defendants to protect Joyce's as promised and required—nevertheless asked if Joyce's would sue or go to the media. Katzeff told Defendant Murtha that suing was not his intention at that time, but he had to look out for the best interest of his company, so he was not sure what would need to happen.

92.     The next day, Wednesday, May 18, Katzeff received a call from Defendant Bayley, a PNC employee, who informed Katzeff that he would be taking over communications for PNC. Defendant Bayley told Katzeff that Defendant Murtha would not be permitted to speak further about the fraudulent wires, that all communications about the incident would need to go through attorneys, and that PNC's in-house counsel Priya Roy would be in touch.

93.     After PNC required communications about the wires to go through counsel, on May 23, Brandon Walls, VP of Treasury Management Sales for PNC, met with Katzeff to pitch him yet again on new accounts and additional fraud protection services that had not been offered or recommended to Joyce's during the PINACLE setup less than six months earlier.

94.     Defendant Murtha participated in discussions of new accounts and additional fraud protections. When Mr. Walls described these additional protections, Defendant Murtha, who was part of the team that had previously sold Joyce's on its business accounts and protections, told Katzeff directly and in no uncertain terms that he had never heard of these security options.

95.     Defendant Murtha, along with Defendant Hall, were tasked with selling Joyce's on PNC's services and security, and were held out by PNC as experts in this area, but PNC and Defendants Murtha and Hall failed to offer appropriate security—because, despite their duty to know, they were grossly negligent in failing to understand PNC's own security offerings and the security measures and controls required to keep Joyce's safe.

96.     Katzeff subsequently opened a new account with PNC for the sole purpose of holding the limited funds that remained after the fraud and to receive recoveries from the fraud.

97.     On June 1, Defendant Bayley sent Joyce's a letter purporting to explain the overdraft on Joyce's operating account (1519). According to Defendant Bayley, on May 13, 2022 there was a transfer of $233,180.00 from Joyce's merchant account (4679) to the operating account. However, after the transfer, a hold was placed on the merchant account, which prevented the transferred funds from debiting the operating account. Notwithstanding this hold, Defendant Bayley claimed the transfer somehow "temporarily" increased the balance of the operating account, making it possible for money to be wired from the account without the funds actually being in the account. Defendant Bayley's letter informed Joyce's that this resulted in an operating

account balance of negative $190,558.05, which PNC deemed an overdraft that Joyce's would have to repay.

98.     Defendant Bayley stated that PNC would recoup its remaining overdraft losses (the negative balance on the 1519 account) from any funds recovered from the fraud, and, if that did not cover the loss, it would recoup any remaining loss from the new 8231 account that was opened after the fraud.

99.     Thus, despite appreciating the enormous losses that Joyce's had suffered, including because of unauthorized overdrafts, Defendant Bayley and PNC decided that they would knowingly disregard the risk of harm to Joyce's and allow PNC to help themselves to recovered funds intended to cover Joyce's losses.

100.     PNC disclaimed all responsibility for any losses.

101.     PNC followed up Defendant Bayley's letter on July 2 with a collection demand for a "cashier's check or money order" for the alleged overdraft on the closed 1519 operating account, which in that correspondence it calculated as $191,977.07.

102.     Similarly, on May 31 and July 5, 2022, PNC continued to make matters worse by improperly charging Joyce's $434.85 and $360.41 for its own "corporate analysis" related to the events just described.

### *PNC Kept Joyce's in the Dark About Recovery Efforts*

103.     On June 2, 2022, Joyce's counsel sent letters to Bank of America and JPMorgan asking them to preserve documents and providing them with details on the fraudulent wires they received on May 12 and 13.

104.     Joyce's counsel told the Beneficiary Banks about his understanding that the beneficiary accounts were frozen during the Beneficiary Banks' investigations. He also asked to speak with each bank about getting Joyce's funds returned.

105.     On June 27, Joyce's counsel received an email from counsel for PNC purporting to provide the status of the transfers and attempted transfers from the Joyce's 1519 account.

106.     PNC's counsel indicated that "JPMorgan Chase is taking steps to recover additional funds that could lead to the asset recovery window exceeding their standard recovery timeframe [of 30-45 days]." PNC's counsel stated that it anticipated an "estimated recovery" of 25% of the funds that went to JPMorgan and an unspecified "partial" recovery of the funds sent to Bank of America. The Bank of America recovery window was noted at 60-90 days.

107.     On July 5, Joyce's counsel responded, stating that the low recovery from JPMorgan was a "shock and disappointment" and that the indication of a "partial" recovery by Bank of America was not helpful.

108.     On July 14, PNC's counsel attempted to distance Defendants from the catastrophe, responding that "the results of the wire recall process … are beyond PNC's control" and that "PNC has only limited and necessarily second-hand insight into the expected amount and timing of the return of funds by a beneficiary bank." PNC said it would continue to pursue the recalls of funds, and PNC again, thorough counsel, denied any responsibility for any losses.

109.     PNC counsel's July 14 letter also informed Joyce's that JPMorgan had recovered $224,597.17, which would be credited to Joyce's account. This constituted roughly one-quarter of Joyce's direct losses to accounts at JPMorgan. PNC's counsel did not say which transfers had been successfully recalled, whether there would be any additional recovery from JPMorgan, or how long such recovery might take.

110.    PNC's counsel also stated that it did not expect any specificity from Bank of America regarding its recovery efforts until early August.

111.    Once the funds recovered from JPMorgan arrived in Joyce's 1519 account, PNC promptly withdrew $192,337.48 to pay itself for the overdraft, interest, and fees.

112.    On July 20, 2022, counsel for Joyce's requested additional information about the recovery efforts and communications between PNC and the Beneficiary Banks.

113.    In response, PNC eventually produced one side of its initial communications with the Beneficiary Banks, but it refused to produce any of the ensuing correspondence and, more generally, any documentation whatsoever that might give Joyce's meaningful insight into recovery efforts.

114.    In addition to failing to provide Joyce's with meaningful information about recovery efforts and discussions with the Beneficiary Banks, Defendants also kept Joyce's in the dark about, among other things, how the cybercriminals were able to defeat every one of PNC's controls and security, allowing the accounts to be taken over and fraudulent wires to be completed one after another until the money was effectively gone.

115.    On August 23, 2022, without any explanation of why or how, PNC notified Joyce's that it would receive recoveries on certain transfers to Bank of America totaling $293,542.47.

116.    On September 9, 2022, again without any explanation of why or how, PNC notified Joyce's that it will receive one final recovery of approximately $6,500, and that it did not expect any additional recoveries.

### *Joyce's Has Suffered Substantial Losses Due to PNC's Security Failures and Negligence*

117.    As of the date of this filing, Joyce's current calculation of the unrecovered balance stands at approximately $1.1 million.

118.    Joyce's sustained additional losses caused by PNC, including from PNC's fee charges related to the fraud, interest charged on the improper overdraft, and interest Joyce's was unable to earn on the stolen funds.

119.    Joyce's was also directly injured by having to run a jewelry business with minimal cash and frozen accounts—that are still, to this day, somehow accruing fees and charges. This caused a multitude of harms, financial and reputational. For example, Joyce's had to change its purchasing practices, causing it to lose out on important discounts from trade show purchases that it had relied on. Joyce's employees and vendors could not cash or deposit their paychecks and payments. Joyce's senior management had to take its focus off its business to fight through the crisis caused by PNC's failure to keep its money safe.

## COUNT I
### (LIABILITY PURSUANT TO 13 PA.C.S.A. § 4A101, *ET SEQ.*)
### *(Against Defendant PNC Bank, N.A.)*

120.    Plaintiff repeats and realleges all of its previous allegations as if set forth fully herein.

121.    As described above, PNC received fraudulent electronic payment orders on Joyce's accounts at PNC on May 12 and 13, 2022.

122.    These payment orders were not authorized by Joyce's, nor was Joyce's bound by these orders pursuant to the law of agency.

123.    These payment orders were not effective as the orders of Joyce's pursuant to 13 PA.C.S.A. § 4A102.

124.    To the extent Joyce's and PNC entered into an agreement that the authenticity of payment orders issued to PNC in the name of Joyce's would be verified pursuant to a security procedure, those procedures were inadequate and not as promised to Joyce's.

125.    To the extent Joyce's and PNC entered into an agreement that the authenticity of payment orders issued to PNC in the name of Joyce's would be verified pursuant to a security procedure, such a security procedure was not a commercially reasonable method of providing security against unauthorized payment orders for at least the following reasons:

    a.    PNC did not detect, monitor, or protect against the fraudulent activity on Joyce's accounts despite the highly suspect activity as identified throughout this Complaint;

    b.    PNC failed to have controls that caused it to contact Joyce's to alert it to the unusual account activity; and

    c.    PNC failed to monitor and review suspect payment orders before submitting them for payment.

126.    To the extent Joyce's and PNC entered into an agreement that the authenticity of payment orders issued to PNC in the name of Joyce's would be verified pursuant to a security procedure, PNC did not accept the payment orders issued on May 12 and 13, 2022 in good faith and in compliance with that security procedure for at least the following reasons:

    a.    PNC failed to apply the security testing procedure to each wire transaction individually or collectively;

    b.    PNC failed to require multifactor authentication before initiating the relevant transactions;

    c.    PNC failed to require tokens to before initiating the relevant transactions;

    d.    PNC failed to require dual control authorization before initiating the relevant transactions;

    e.    PNC failed to inform Joyce's of any unusual activity on its corporate accounts until after Joyce's notified PNC of the fraudulent wire transfers; and

f.   PNC was unable to prevent the fraudulent wire transfers or freeze Joyce's accounts after Joyce's notified PNC of the fraudulent wire transfers.

127.   The fraudulent payment orders issued on May 12 and 13, 2022 were not caused directly or indirectly by a person entrusted at any time with duties to act for Joyce's with respect to payment orders or any security procedure that PNC had in place.

128.   The fraudulent payment orders issued on May 12 and 13, 2022 were not caused directly or indirectly by a person who obtained access to the transmitting facilities of Joyce's, which required at least multi-factor authentication and dual-control authorization.

129.   The fraudulent payment orders issued on May 12 and 13, 2022 were not initiated or approved directly or indirectly by Joyce's or any of its employees.

WHEREFORE, Plaintiff Joyce's Jewelry, Inc. respectfully requests that the Court enter a Judgment against Defendant PNC Bank, N.A., for a full refund to Joyce's of the net outstanding balance of fraudulent payment orders issued on May 12 and 13, 2022, plus interest, pursuant to 13 Pa.C.S.A. § 4A101 *et seq*., and for additional damages in an amount to be determined at trial, together with punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

### COUNT II
### (NEGLIGENCE)
### *(Against Defendant PNC Bank, N.A.)*

130.   Plaintiff repeats and realleges all of its previous allegations as if set forth fully herein.

131.   PNC had a duty to employ controls, monitoring, and security procedures to ensure that parties other than Joyce's would not be able to effect transfers of funds from Joyce's accounts by fraudulent means.

132.    PNC had a duty to employ reasonable care in preventing losses after the fund transfers.

133.    PNC breached this duty by failing to use reasonable care in placing holds on and/or freezing Joyce's accounts to prevent the fraudulent transfer of Joyce's funds even after Joyce's notified PNC that its accounts had been compromised.

134.    PNC also had a duty to employ reasonable care in recovering the fraudulently transferred funds from the Beneficiary Banks.

135.    PNC breached this duty by failing to employ reasonable care in recovering the fraudulently transferred funds and otherwise failing to protect Joyce's accounts once alerted (by Joyce's or internally, through their own systems) to the irregular and suspicious activity on Joyce's accounts.

136.    As a direct and proximate cause of PNC's negligent, grossly negligent and/or careless conduct, Joyce's sustained significant harm as described above.

137.    PNC's breach of duty was undertaken with malice or is so outrageous that malice can be implied from its actions.

WHEREFORE, Plaintiff Joyce's Jewelry, Inc. respectfully requests that the Court enter a Judgment against Defendant PNC Bank, N.A., for a full refund to Joyce's of the net outstanding balance of fraudulent payment orders issued on May 12 and 13, 2022, plus interest and for damages in an amount to be determined at trial, together with punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

## COUNT III
## (BREACH OF FIDUCIARY DUTY)
### *(Against Defendant PNC Bank, N.A.)*

138.    Plaintiff repeats and realleges all of its previous allegations as if set forth fully herein.

139.    As Joyce's bank, PNC owed fiduciary duties to Joyce's that included, without limitation, the duties to safeguard Joyce's funds and employ security procedures to ensure that parties other than Joyce's would not be able to effect transfers of funds from Joyce's accounts by fraudulent means.

140.    PNC had a duty to employ reasonable care in preventing losses after the funds transfers.

141.    PNC breached this duty by failing to use reasonable care in placing holds on and/or freezing Joyce's accounts to prevent the fraudulent transfer of Joyce's funds even after Joyce's notified PNC that its accounts had been compromised.

142.    PNC also had a duty to employ reasonable care in recovering the fraudulently transferred funds from the Beneficiary Banks.

143.    PNC breached this duty by failing to employ reasonable care in recovering the fraudulently transferred funds and otherwise failing to protect Joyce's accounts once alerted (by Joyce's or internally, through their own systems) to the irregular and suspicious activity on Joyce's accounts.

144.    PNC's breach of fiduciary duties has caused significant harm to Joyce's as described above.

145.    PNC's breach of fiduciary duties was undertaken with malice or is so outrageous that malice can be implied from its actions.

WHEREFORE, Plaintiff Joyce's Jewelry, Inc. respectfully requests that the Court enter a Judgment against Defendant PNC Bank, N.A., for a full refund to Joyce's of the net outstanding balance of fraudulent payment orders issued on May 12 and 13, 2022, plus interest and for damages in an amount to be determined at trial, together with punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

### COUNT IV
### (BREACH OF CONTRACT)
*(Against Defendant PNC Bank, N.A.)*

146.    Plaintiff repeats and realleges all of its previous allegations as if set forth fully herein.

147.    Between August and November 2021, Joyce's accounts were updated with new features and PNC's recommended security on PNC's PINACLE platform.

148.    The services PNC agreed to provide to Joyce's through its PINACLE platform were outlined in PNC's Treasury Management Services Comprehensive Agreement (the "Agreement"). The Agreement is attached as Exhibit 1.

149.    Joyce's has performed all conditions, covenants, and promises on Joyce's part in accordance with the terms and conditions of the Agreement.

150.    As described above, PNC improperly allowed nearly $200,000 that was not available in Joyce's operating account (1519) to be transferred to cover the fraudulent withdrawals.

151.    Pursuant to the Account Agreement for Business Accounts – Withdrawals From Your Account, attached as Exhibit 2, which PNC expressly incorporated into the Agreement, before allowing a withdrawal from a Joyce's account with insufficient funds, PNC was required to consider:

(1) [T]he deposits and withdrawals posted that day to [Joyce's] account, and

(2) all pending electronic transactions . . . for which PNC has received notice, even if those transactions have not yet posted to your account.

(Exhibit 2 at 2.)

152. PNC breached the Agreement by failing to consider the fraudulent deposits and withdrawals or the pending electronic transactions posted to Joyce's accounts on the date of the improperly designated overdraft.

153. PNC further breached the Agreement by designating the transfer from Joyce's operating account (1519) as an overdraft, charging interest on that amount, and wrongfully assessing fees to Joyce's for analysis of the fraudulent activity that PNC should have been monitoring and should have prevented.

154. After Joyce's informed the Beneficiary Banks of the fraudulent wire transfers that PNC allowed to be perpetrated against Joyce's accounts, the Beneficiary Banks were able to recover a portion of Joyce's losses.

155. The Beneficiary Banks attempted to return the recovered funds to Joyce's by transferring them to Joyce's accounts at PNC or by earmarking those recovered funds for Joyce's. PNC, however, used the recoveries that should have reduced Joyce's losses to cover the overdraft that PNC improperly allowed in connection with the fraudulent activity on Joyce's accounts.

156. As a direct and proximate result of PNC's breach of the Agreement, Joyce's has suffered damages and losses in an amount to be determined at trial.

WHEREFORE, Plaintiff Joyce's Jewelry, Inc. respectfully requests that the Court enter a Judgment against Defendant PNC Bank, N.A., for breach of its contract with Joyce's and a full refund to Joyce's of the net outstanding balance of fraudulent payment orders issued on May 12

and 13, 2022, plus interest and for damages in an amount to be determined at trial, together with interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

### COUNT V
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)
#### *(Against Defendant PNC Bank, N.A.)*

157.    Plaintiff repeats and realleges all of its previous allegations as if set forth fully herein.

158.    Between August and November 2021, Joyce's accounts were updated with new features and PNC's recommended security on PNC's PINACLE platform.

159.    The services PNC agreed to provide to Joyce's through its PINACLE platform were outlined in PNC's Treasury Management Services Comprehensive Agreement (the "Agreement").

160.    The Agreement was subject to an implied covenant of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties—both explicit and fairly implied—and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contract. These include the covenant that PNC would act fairly and in good faith in carrying out its contractual obligations to safeguard Joyce's deposits against fraudulent transfers.

161.    Joyce's has performed all conditions, covenants, and promises on Joyce's part in accordance with the Agreement.

162.    As described above, PNC improperly allowed nearly $200,000 not available in Joyce's operating account (1519) to be transferred to cover the fraudulent withdrawals.

163.    Over Joyce's protest, PNC has designated that transfer as an overdraft and has been charging interest on that amount.

164.     PNC also assessed fees to Joyce's for analysis of the fraudulent activity that PNC should have been monitoring and should have prevented.

165.     PNC used recoveries that should have reduced Joyce's losses to cover the overdraft that PNC improperly allowed in connection with the fraudulent activity on Joyce's accounts.

166.     PNC's failure to act in good faith by designating the transfer from Joyce's operating account (1519) as an overdraft, charging interest on that amount, and wrongfully assessing fees to Joyce's for, among other things, analysis of the fraudulent activity that PNC should have been monitoring and should have prevented denied Joyce's the full benefit of its bargain.

167.     Accordingly, as a direct and proximate result of PNC's breach of the covenant of good faith and fair dealing, Joyce's has suffered damages and losses in an amount to be determined at trial.

WHEREFORE, Plaintiff Joyce's Jewelry, Inc. respectfully requests that the Court enter a Judgment against Defendant PNC Bank, N.A., for breach of the covenant of good faith and fair dealing implied in its contract with Joyce's and a full refund to Joyce's of the net outstanding balance of fraudulent payment orders issued on May 12 and 13, 2022, plus interest and for damages in an amount to be determined at trial, together with interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

### COUNT VI
### (UNJUST ENRICHMENT)
*(Against Defendant PNC Bank, N.A.)*

168.     Plaintiff repeats and realleges all of its previous allegations as if set forth fully herein.

169.     As described above, PNC improperly allowed nearly $200,000 not available in Joyce's operating account (1519) to be transferred to cover the fraudulent withdrawals.

170.    Over Joyce's protest, PNC has designated that transfer as an overdraft and has been charging interest on that amount.

171.    PNC also assessed fees to Joyce's for analysis of the fraudulent activity that PNC should have been monitoring and should have prevented.

172.    After Joyce's informed the Beneficiary Banks of the fraudulent wire transfers that PNC allowed to be perpetrated against Joyce's accounts, the Beneficiary Banks were able to recover a portion of Joyce's losses.

173.    The Beneficiary Banks attempted to return the recovered funds to Joyce's by transferring them to Joyce's accounts at PNC or by earmarking those recovered funds for Joyce's.. PNC, however, wrongfully used the recoveries that should have reduced Joyce's losses to cover the overdraft that PNC improperly allowed in connection with the fraudulent activity on Joyce's accounts.

174.    Before wrongfully using the recovered funds to cover the overdrafts that it improperly assessed to Joyce's operating account, PNC had actual knowledge that it was its own failure to properly effectuate the hold that it placed on Joyce's merchant account (4679) that caused the overdraft to be assessed.

175.    PNC also had actual knowledge that Joyce's business had been significantly harmed by being forced to operate with very little cash on hand due to the failure of PNC's personnel and security procedures.

176.    Despite its actual knowledge of the risks and harms faced by Joyce's, as well as its knowledge of the ongoing recovery efforts by the Beneficiary Banks, PNC consciously disregarded Joyce's rights to the recovered funds and instead used them to cover an overdraft caused by its own systemic failures.

177.     PNC's improper use of the recovered funds has been undertaken with malice, or is so outrageous that malice can be implied from PNC's actions.

178.     For all the reasons described previously in this Complaint, it would be unjust and inequitable to permit PNC to retain the benefits of the aforementioned improperly designated overdraft, repayment of the overdraft, interest and fees wrongfully sought and collected from Joyce's accounts without Joyce's authorization.

WHEREFORE, Plaintiff Joyce's Jewelry, Inc. respectfully requests that the Court enter a Judgment against Defendant PNC Bank, N.A., for a full refund to Joyce's of the net outstanding balance of fraudulent payment orders issued on May 12 and 13, 2022, plus interest and for damages in an amount to be determined at trial, together with punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

## COUNT VII
## (CONVERSION)
### *(Against Defendant PNC Bank, N.A.)*

179.     Plaintiff repeats and realleges all of its previous allegations as if set forth fully herein.

180.     As described above, PNC improperly allowed nearly $200,000 not available in Joyce's operating account (1519) to be used to cover the fraudulent withdrawals.

181.     By its improper designation of these funds as an overdraft and charging of interest and fees, and by claiming portions of recoveries from Beneficiary Banks for itself to pay for the alleged overdraft, interest and fees, PNC has converted and will continue to convert funds belonging to Joyce's.

182.    After Joyce's informed the Beneficiary Banks of the fraudulent wire transfers that PNC allowed to be perpetrated against Joyce's accounts, the Beneficiary Banks were able to recover a portion of Joyce's losses.

183.    The Beneficiary Banks attempted to return the recovered funds to Joyce's by transferring them to Joyce's accounts at PNC or by earmarking those recovered funds for Joyce's. PNC, however, wrongfully used the recoveries that should have reduced Joyce's losses to cover the overdraft that PNC improperly allowed in connection with the fraudulent activity on Joyce's accounts.

184.    By its wrongful use of the funds recovered by the Beneficiary Banks, PNC has converted and will continue to convert funds belonging to Joyce's.

185.    Before wrongfully converting the recovered funds to cover the overdrafts that it improperly assessed to Joyce's operating account, PNC had actual knowledge that it was its own failure to properly effectuate the hold that it placed on Joyce's merchant account (4679) that caused the overdraft to be assessed.

186.    PNC also had actual knowledge that Joyce's business had been significantly harmed by being forced to operate with very little cash on hand due to the failure of PNC's personnel and security procedures.

187.    Despite its actual knowledge of the risks and harms faced by Joyce's, as well as its knowledge of the ongoing recovery efforts by the Beneficiary Banks, PNC consciously disregarded Joyce's rights to the recovered funds and instead converted them to cover an overdraft caused by its own systemic failures.

188.    PNC's improper use of the recovered funds has been undertaken with malice, or is so outrageous that malice can be implied from PNC's actions.

189.     Joyce's has suffered significant damages as a direct and proximate result of PNC's conversion of these funds.

WHEREFORE, Plaintiff Joyce's Jewelry, Inc. respectfully requests that the Court enter a Judgment against Defendant PNC Bank, N.A., for a full refund of any funds taken by PNC for any alleged overdraft as well as any fees and interest related to the events of May 12 and 13, 2022, and for damages in an amount to be determined at trial, together with punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

## COUNT VIII
## (NEGLIGENCE)
### *(Against the Individual Defendants)*

190.     Plaintiff repeats and realleges all of its previous allegations as if set forth fully herein.

191.     At all times discussed in and relevant to this Complaint, Defendants Bayley, Frederick, Gratchic, Hall, and Murtha were employed by PNC and worked on Joyce's accounts.

192.     At all times discussed in and relevant to this Complaint, Defendants Bayley, Frederick, Gratchic, Hall, and Murtha had a duty to exercise reasonable care, including in their implementation of the Agreement and PNC's security and controls, their training of Joyce's employees to use PNC's services, and in their monitoring and maintenance of Joyce's accounts.

193.     Defendants Bayley, Frederick, Gratchic, Hall, and Murtha acted negligently by failing to offer and implement appropriate security for Joyce's, failing to properly train Joyce's employees to use PNC's PINACLE platform, and by failing to reasonably respond to the activity on Joyce's accounts at PNC that form the basis of this action.

194.    As a direct and proximate cause of the negligence, gross negligence, and/or careless conduct of Defendants Bayley, Frederick, Gratchic, Hall, and Murtha, Joyce's sustained significant harm as described above.

WHEREFORE, Plaintiff Joyce's Jewelry, Inc. respectfully requests that the Court enter a Judgment against Defendants Bayley, Frederick, Gratchic, Hall, and Murtha, for a full refund of any funds taken by PNC for any alleged overdraft as well as any fees and interest related to the events of May 12 and 13, 2022, and for damages in an amount to be determined at trial, together with punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

### COUNT IX
### (RESPONDEAT SUPERIOR)
### *(Against Defendant PNC Bank, N.A.)*

195.    Plaintiff repeats and realleges all of its previous allegations as if set forth fully herein

196.    PNC is liable for all common law torts its employees commit in the scope of their employment under the doctrine of respondeat superior.

197.    At all times discussed in and relevant to this Complaint, Defendants Bayley, Frederick, Gratchic, Hall, and Murtha were employees of PNC.

198.    At all times discussed in and relevant to this Complaint, all PNC employees, including Defendants Bayley, Frederick, Gratchic, Hall, and Murtha, acted within the course and scope of their employment by PNC.

199.    At all times discussed in and relevant to this Complaint, PNC's employees, including Defendants Bayley, Frederick, Gratchic, Hall, and Murtha, had a duty to exercise reasonable care in the implementation of the Agreement, their training of Joyce's employees to

use PNC's PINACLE platform, and their maintenance of Joyce's accounts on PNC's PINACLE platform.

200.    PNC employees, including Defendants Bayley, Frederick, Gratchic, Hall, and Murtha, acted negligently by failing to offer and implement appropriate security for Joyce's, failing to properly train Joyce's employees to use PNC's PINACLE platform, and by failing to effectively communicate and/or reasonably respond to the activity on Joyce's accounts at PNC that form the basis of this action.

201.    As a direct and proximate cause of the negligence, gross negligence, and/or careless conduct of PNC's employees, including Defendants Bayley, Frederick, Gratchic, Hall, and Murtha, Joyce's sustained significant harm as described above.

202.    PNC is liable to Plaintiff for the harm caused by its employees, including Defendants Bayley, Frederick, Gratchic, Hall, and Murtha, under the doctrine of respondeat superior.

WHEREFORE, Plaintiff Joyce's Jewelry, Inc. respectfully requests that the Court enter a Judgment against Defendant PNC Bank, N.A., for a full refund of any funds taken by PNC for any alleged overdraft as well as any fees and interest related to the events of May 12 and 13, 2022, and for damages in an amount to be determined at trial, together with punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

Respectfully submitted this 21st day of October 2022.

Joyce's Jewelry, Inc.            ,
Plaintiff

By Howard Kaplan
   Of Counsel

Howard Kaplan
KAPLAN & GRADY LLC
1953 N. Clybourn Ave., Ste. 274
Chicago, IL 60614
(312) 852-2641
howard@kaplangrady.com

*Counsel for Plaintiff*
*Admitted Pro Hac Vice*

Carl A. Frankovitch
PA Atty ID No. #313978
FRANKOVITCH, ANETAKIS,
SIMON, DECAPIO & PEARL, LLP
337 Penco Road
Weirton, WV 26062
(304) 723-4400

*Counsel for Plaintiff*

**VERIFICATION**

I, Brandon Katzeff, authorized agent for Joyce's Jewelry, Inc., the Plaintiff in the

foregoing matter, hereby state that the facts set forth in the foregoing Amended Complaint are

true and correct to the best of my knowledge, information, and belief.

Date: October 20, 2022

Brandon Katzeff

## CERTIFICATE OF SERVICE

I, Howard Kaplan, an attorney, hereby certify on October 21, 2022, I caused the foregoing to be filed using the Court's CM/ECF, which effected service on all counsel of record.

/s/ Howard Kaplan
Howard Kaplan
Attorney for Plaintiff